

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-25-2003

# Jalal v. USA

Precedential or Non-Precedential: Precedential

Docket No. 02-1839

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation
"Jalal v. USA" (2003). *2003 Decisions.* Paper 224.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/224

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed September 25, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-1839

CONTENTS OF ACCOUNT NUMBER 03001288, HELD IN
THE NAME OF TASNEEM JALAL LOCATED AT UNION
NATIONAL BANK, RASHIDIYA BRANCH, DEIRA-DUBAI,
UNITED ARAB EMIRATES; CONTENTS OF ACCOUNT
NUMBER 01123121673 HELD IN THE NAME OF
TASNEEM JALAL LOCATED AT HABIB BANK AG ZURICH
SHARJAH BRANCH, UNITED ARAB EMIRATES;
CONTENTS OF ACCOUNT NUMBER 01120121673, HELD
IN THE NAME OF TASNEEM JALAL LOCATED AT HABIB
BANK AG ZURICH, SHARJAH BRANCH, UNITED ARAB
EMIRATES; TASNEEM JALAL

v.

UNITED STATES OF AMERICA

Tasneem Jalal,
Appellant

On Appeal from the United States District Court
for the District of New Jersey

District Court Judge: The Honorable William G. Bassler
(D.C. Civ. No. 00-cv-02630)

Argued on December 12, 2002

Before: FUENTES, STAPLETON and O'KELLEY,*
*Circuit Judges*

---

* Honorable William C. O'Kelley, Senior District Judge for the Northern
District of Georgia, sitting by designation.

(Opinion Filed: September 25, 2003)

Martin L. Schmukler (Argued)
41 Madison Avenue
5th Floor
New York, NY 10010

*Counsel for Appellant*

Peter W. Gaeta (Argued)
Office of the United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102

*Counsel for Appellees*

---

**OPINION OF THE COURT**

---

*FUENTES*, Circuit Judge:

Appellant Tasneem Jalal ("Jalal") appeals an order of the United States District Court for the District of New Jersey denying his motion to dismiss, or in the alternative, for summary judgment on this civil action brought by the United States for the forfeiture of funds located in three bank accounts in the United Arab Emirates ("U.A.E."). The United States seeks forfeiture of the funds because they are the proceeds of illegal heroin trafficking. Jalal contends that the action should be dismissed because it was not filed within the five-year statute of limitations period under 19 U.S.C. § 1621. Because the statute of limitations was tolled during the time the funds were absent from the United States, we conclude the statute did not run against the Government's forfeiture claims against Jalal's accounts. Accordingly, we affirm the judgment of the District Court.

## I.   Background

On or about August 19, 1992, Special Agents of the New Jersey Field Division of the Drug Enforcement Administration ("DEA") arrested Jalal for his participation in the delivery of 250 grams of heroin into New Jersey.

During the execution of a search warrant at Jalal's home, DEA Agents found three passports in the name of "Tasnin [sic] Jalal," various forms of identification, and the records of bank accounts in the United States, Pakistan, and the U.A.E. Specifically, the search yielded deposit slips for the three Defendant Accounts in the U.A.E., which altogether contain approximately $1.8 million Dirhams.[1] The bank records indicate that the Defendant Accounts were funded between November 24, 1991 and April 1, 1992.

Jalal was subsequently indicted for Conspiracy to Distribute and Possess Heroin in violation of 21 U.S.C. § 846, and Possession with Intent to Distribute Heroin in violation of 21 U.S.C. § 841. He pleaded guilty to both counts on October 15, 1992. In the course of his cooperation with the Government, Jalal admitted that he had been engaged in the trafficking of heroin from Pakistan for the last sixteen years. Although all deposits to the Defendant bank accounts had been made during the time period in which Jalal was engaged in heroin trafficking and although he had no other legitimate source of income during that period, Jalal claimed that the funds derived from the sale of real estate in Pakistan and gold trading in Dubai.[2]

In October 1992, agents of the DEA contacted law enforcement officials in the U.A.E. to provide information concerning Jalal and to inquire whether the Defendant Accounts could be frozen under U.A.E. law. The Dubai Police obtained a court order freezing the accounts while the investigation continued.

Meanwhile, on June 29, 1993, Jalal was sentenced to 108 months imprisonment. Upon completion of his sentence, Jalal, a national of Pakistan, was committed to the custody of the Immigration and Naturalization Service. The INS deported Jalal to Pakistan on September 26, 2000.

---

1. The Dirham is the monetary unit of the U.A.E. The contents of the accounts equaled approximately $500,000.

2. Dubai and Sharjah, where the Defendant Accounts are located, are two of the seven sheikdoms comprising the United Arab Emirates. Abu Dhabi is the capital of the Emirates.

On August 2, 1994, DEA representatives met with officials of the Dubai Police. The officials advised the DEA that they were optimistic that the Dubai court would entertain a motion to allow the Dubai Police to seize the accounts if probable cause could be established that the funds in the account were generated by narcotics trafficking. DEA representatives held a similar meeting in Sharjah regarding the accounts located there.

During the same general time frame, Abu Dhabi, Dubai and Sharjah had submitted a collective report regarding money laundering in the U.A.E. to the Ministry of the Interior, the first step for passage of a federal law. The DEA believed that officials in the U.A.E. were going to use the Defendant Accounts to establish a precedent. However, in November 1994, DEA representatives learned that no further unilateral action would be taken by U.A.E. law enforcement officials. The only alternatives would be to pursue forfeiture through diplomatic channels or await passage of asset seizure/forfeiture legislation in the U.A.E.

At a meeting on December 12, 1994, the Deputy Attorney General of the U.A.E. informed an attorney of the United States Department of Justice ("DOJ"), as well as other United States officials present, that the U.A.E. was not in full compliance with the Vienna Convention of 1998 concerning money laundering, but that he expected passage of a U.A.E. forfeiture law within six months. Based on this conversation, the DOJ attorney believed that the U.A.E. would not act on the Jalal matter until passage of this legislation. On June 30, 1995, the DOJ Attorney wrote to the U.S. Embassy in the U.A.E. inquiring whether the U.A.E. had enacted the forfeiture legislation.

On November 21, 1995, the Office of International Affairs of the DOJ made a formal treaty request to the U.A.E. pursuant to the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances. Almost four years later, on September 27, 1999, the Senior Legal Advisor at the U.A.E. Ministry of Foreign Affairs informed U.S. officials that, before the U.A.E. government could comply with the DOJ's request to seize and forfeit the Defendant Accounts, the U.A.E. would need a United States court order specifically requesting this action. He also

informed U.S. authorities that the accounts had been frozen by the U.A.E. since May 1997 as a result of the November 1995 treaty request.

On May 21, 2000, the United States filed a forfeiture complaint in the United States District Court for the District of New Jersey. The DOJ forwarded certified copies of the complaint and warrants for arrest *in rem* to the U.S. Embassy in Abu Dhabi on June 28, 2000, for service upon the appropriate U.A.E. officials. Officials from the U.S. Embassy delivered the complaint and warrants for arrest to the Ministry of Foreign Affairs of the U.A.E. on July 1, 2000. On October 11, 2001, the District Court denied Jalal's Motion to Dismiss, or, in the alternative, for Summary Judgment. Thereafter, the District Court entered a consent judgment forfeiting the contents of Jalal's three accounts in the U.A.E. and directing that the funds be deposited into the Department of Justice Asset Forfeiture Fund. As part of the judgment, Jalal reserved the right to challenge, on appeal, the District Court's determination that the Government's forfeiture action was not barred by the statute of limitations. This appeal followed.

## II. Discussion

### A. *Jurisdiction*

We exercise appellate jurisdiction over a final order of a district court pursuant to 28 U.S.C. § 1291. Because resolution of the issues on this appeal involves the interpretation and application of legal precepts, our standard of review is plenary. *See Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 453 (3d Cir. 2001).

The District Court concluded that it had subject matter jurisdiction over this forfeiture action pursuant to 28 U.S.C. § 1355(a) and that venue was proper in the District of New Jersey based on 28 U.S.C. §§ 1355(b)(1) & (2). However, the District Court reasoned that, despite having subject matter jurisdiction over the forfeiture action and being the proper venue for the commencement of the action, it could not reach the merits of the case absent *in rem* jurisdiction over the Defendant property. After reviewing the relevant facts, the Court found that it had constructive control over the

Defendant Accounts as of September 27, 1999, the date authorities in the U.A.E. indicated that they would enforce a forfeiture order of a United States court. As a result, the Court concluded that it had *in rem* jurisdiction over the Defendant Accounts when the Government commenced the forfeiture proceedings.

We find that the District Court had jurisdiction over the Defendant Accounts solely based on § 1355(b)(2). In its past form, § 1355 provided that "[t]he district courts shall have original jurisdiction, . . . of any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress . . . ." *See* Pub. L. No. 102-550, 106 Stat. 4062, Title XV, § 1521 (codified as amended at 28 U.S.C. § 1355). In 1992, Congress amended § 1355 and the above quoted provision became § 1355(a). In addition to other language, Congress added § 1355(b), which states as follows:

> (b)(1) A forfeiture action or proceeding may be brought in —
>
> > (A) the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred, or
> >
> > (B) any other district where venue for the forfeiture action or proceeding is specifically provided for in section 1395 of this title or any other statute.
>
> (2) Whenever property subject to forfeiture under the laws of the United States is located in a foreign country, or has been detained or seized pursuant to legal process or competent authority of a foreign government, an action or proceeding for forfeiture may be brought as provided in paragraph (1), or in the United States District court for the District of Columbia.

Though the District Court concluded that § 1355(b) merely provides for venue, we find that it also grants district courts jurisdiction over the property at issue in forfeiture actions based on the plain language of the statute. Another subpart of § 1355 specifically refers to § 1355(b) as granting the appropriate court jurisdiction over

a forfeiture action. In particular, § 1355(d) contains the language "[a]ny court with jurisdiction over a forfeiture action pursuant to subsection (b) . . . ." We doubt that Congress would make such a reference if, in fact, it did not intend for subsection (b) to provide for jurisdiction.

While we are satisfied that the § 1355(b) provides for jurisdiction over property in a forfeiture action based on the language of the statute, we recognize that one of our sister circuits has reached the opposite conclusion. *See United States v. All Funds On Deposit in Any Accounts Maintained in the Names of Meza*, 63 F.3d 148, 152-53 (2d Cir. 1995). Nonetheless, we note that our conclusion is also supported by the explanatory language accompanying the 1992 amendment to the statute. The explanatory language of the Money Laundering Improvements Act, containing the language eventually enacted as 28 U.S.C. § 1355(b) and introduced by Senator D'Amato, indicates that "Title 28, Section 1355, gives the district courts subject matter jurisdiction over civil forfeiture cases." 137 Cong. Rec. S16640, S16642 (1991). The statement further explains that "venue statutes for forfeiture actions provide for venue in the district in which the subject property is located, 28 U.S.C. § 1395, or in the district where a related criminal action is pending, 18 U.S.C. § 981(h)," but that "no statute defines when a court has jurisdiction *over the property that is the subject of the suit.*" *Id.* (emphasis added). After recognizing that this state of affairs had resulted in confusion and constant litigation of jurisdictional issues, the explanatory language states that the "amendment to 28 U.S.C. § 1355, resolves these issues for all forfeiture actions brought by the government." *Id.* In its discussion of subsection (b)(1) and prior venue-for-forfeiture statutes, the explanatory language further states that "it would make no sense for Congress to provide for venue in a district without intending to give the court in that district jurisdiction as well." *Id.* at S16643. Thus, the language added to § 1355 as subsection (b) was intended to solve the problem of defining when a court has jurisdiction over the property that is the subject of the forfeiture proceeding.

The District Court reached its conclusion on jurisdiction based in part on a Second Circuit opinion, which held that

Congress did not intend "to fundamentally alter well-settled law regarding *in rem* jurisdiction" by amending § 1355. *Meza*, 63 F.3d at 152-53 (2d Cir. 1995) (concluding that the district court obtained constructive control, and, as a result *in rem* jurisdiction, over property located in the United Kingdom based on the demonstrated cooperation of British law enforcement officials).[3] The Second Circuit expressed concern about whether an order issued by a district court would be enforceable in the absence of control over property located in a foreign country. *Id.* In discussing the meaning of § 1355(b), the Second Circuit set forth the following language from the explanatory statement of the amendment:

> [I]t is probably no longer necessary to base *in rem* jurisdiction on the location of property if there have been sufficient contacts with the district in which the suit is filed. No statute, however, says this and the issue has to be repeatedly litigated whenever a foreign government is willing to give effect to a forfeiture order issued by a United States court and turn over seized property to the United States if only the United States is able to obtain such an order.

*Id.* (quoting 137 Cong. Rec. S16640, S16643 (1991)). However, the next sentence from the explanatory statement, which is possibly the most telling sentence regarding subsection (b)(2), states that "[s]ubsection (b)(2) resolves this problem by providing for jurisdiction *over such property* in the United States District Court for the District of Columbia, [or] in the district court for the district in which any of the acts giving rise to the forfeiture occurred . . . ." 137 Cong. Rec. S16640, S16643 (1991) (emphasis added). Based on the language of the statute and statements such as this one, we conclude that Congress intended to grant

---

3. A later Second Circuit opinion, *United States v. Certain Funds Located at the Hong Kong & Shanghai Banking Corp.*, 96 F.3d 20, 22 (2d Cir. 1996), stated that "the statute conferring jurisdiction on federal courts over civil forfeiture proceedings was amended to provide district courts with *in rem* jurisdiction over a *res* located in a foreign country." However, in making this statement, the Second Circuit did not reference its previous opinion in *Meza* or acknowledge that it was disagreeing with or, at least calling into question, a previous ruling of that court.

specified district courts jurisdiction over property subject to forfeiture that is located in a foreign country.

The D.C. Circuit has also concluded that, in amending § 1355, "Congress intended the District Court for the District of Columbia, among others, to have jurisdiction to order the forfeiture of property located in foreign countries." *United States v. All Funds in Account in Banco Espanol de Credito, Spain*, 295 F.3d 23, 27 (D.C. Cir. 2002). *Banco Espanol* involved bank accounts located in Spain that contained the proceeds of a cocaine smuggling operation. *Id.* at 24-25. In its opinion, the D.C. Circuit noted the traditional requirement, as developed under admiralty law, of the *res* needing to be within the reach of a court for that court to exercise *in rem* jurisdiction. *Id.* at 25. The Court further recognized that "[t]he forfeiture provisions for drug proceeds adopt the traditional requirements 'for violations of the customs laws' but only 'insofar as applicable and not inconsistent' with the drug forfeiture laws." *Id.* (quoting 21 U.S.C. § 881(d)). In citing the general statute governing forfeiture actions, 28 U.S.C. § 2461(b), which provides that "[u]nless otherwise provided by Act of Congress" they should "conform as near as may be to proceedings in admiralty," the Court conceded that it would have little doubt that the traditional rules of *in rem* jurisdiction would apply had Congress not amended § 1355. *Id.* at 26.

In determining that § 1355 must be enforced, the D.C. Circuit reasoned that perhaps "a forfeiture order of a United States court will not have its full effect until the *res* — the money — is brought within the territory of the United States," however, "Spain's compliance and cooperation determines only the effectiveness of the forfeiture orders of the district courts, not their jurisdiction to issue those orders." *Id.* at 27. We agree with this analysis and hold that the United States District Court for the District of New Jersey had jurisdiction to order the forfeiture of the Defendant Account located in the U.A.E. based on § 1355(b)(2). The U.A.E.'s compliance and cooperation with this forfeiture determines only the effectiveness of the District Court's order, not its jurisdiction to issue that order.

B.  *Statute of Limitations*

The essence of Jalal's argument on appeal is that the District Court erred in denying his motion to dismiss the Government's forfeiture action because the five-year statute of limitations under 19 U.S.C. § 1621 had elapsed by the time the Government filed its complaint. At the time the action was commenced, § 1621 provided, in relevant part, that:

> No suit or action . . . [for] forfeiture of property accruing under the customs laws shall be instituted unless such suit or action is commenced within five years after the time when the alleged offense was discovered; . . . except that . . .
>
>> (2) the time of the absence from the United States of the person subject to the penalty of forfeiture, or of any concealment or absence of the property, shall not be reckoned within the 5-year limitations period.

19 U.S.C. § 1621. The result of this case will be determined by whether or not the statute of limitations was tolled. Specifically, because the five-year period is tolled during the time the property is absent from the United States, we must determine the meaning of the word "absence" within the statute.

Jalal contends that the United States could have established "constructive control" of the Defendant Accounts as early as October 28, 1992, because on that date 28 U.S.C. § 1355 was amended to allow a district court to assert *in rem* jurisdiction over property located in a foreign country. Based on the fact that the U.A.E. and the United States were both parties to the U.N. Convention against Illicit Traffic In Narcotic Drugs and Psychotropic Substances at that point in time — which, according to Jalal, would require U.A.E. to freeze, seize and forfeit the Defendant Accounts based on a request from the United States — Jalal reasons that the United States could have exercised control over the accounts as of that date, and, thus, the Defendant Accounts were no longer absent from the United States.

We reject Jalal's argument. As outlined above, we disagree with the contention that "constructive control"

determines whether the District Court had jurisdiction over the Defendant Accounts. In any event, based on the language of the statute we discern no connection between a district court's ability to exercise jurisdiction and the tolling of the statute. The statute clearly instructs that the five-year statute of limitations shall be tolled during "any concealment or absence of the property." *Id.* The Supreme Court has repeatedly emphasized that Congress "says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992). "[W]hen the statute's language is plain, the sole function of the courts — at least where the disposition required by the text is not absurd — is to enforce it according to its terms." *Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (internal citations and quotations omitted). The plain and ordinary meaning of the term absent is "not present," or "not existing in a place." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 6 (1993). In other words, if the property is "not present" in the United States, it is absent. *See Banco Espanol*, 295 F.3d at 27 ("There is no particular reason . . . for stretching the word 'absence' to mean something other than not present . . . . [I]n short, when property is not here it is absent.").

As of August 21, 1992, the date of Jalal's arrest, the $500,000 in the Defendant Accounts was located in the U.A.E., not in the United States. Because the statute of limitations is tolled during the "absence of the property," we conclude that the statute of limitations had not run on any of Jalal's accounts.[4]

---

4. The Parties disagree about the meaning of the phrase "when the alleged offense was discovered" in § 1621, and thus when the statute of limitations should have begun to run. Jalal argues that the statute refers to the discovery of the underlying criminal offense, which in this case is no later than August 19, 1992 - the date of Jalal's arrest for heroin trafficking. The Government argues that, within the context of § 1621, the discovery of the offense occurs when probable cause is developed to show the connection between an asset and the illegal activity. In this case, the District Court made a factual finding that the Government developed probable cause by late 1994. Because we hold that the statute of limitations does not run on property absent from the United States, we find that this determination is irrelevant to the Court's analysis.

Jalal argues that any property subject to forfeiture that is located in a foreign country is by definition absent from the United States. Consequently, he reasons that if the exception to the period of limitations for forfeiture actions established by § 1621 were read literally, no period of limitations would be applicable to forfeiture actions under § 1355(b)(2) involving property located abroad. According to Jalal, the legislative history indicates that Congress did not consider the potential effects of § 1621 and did not intend such a result.

We disagree. As noted above, when a "statute's language is plain," as is the case here, this Court's sole function "is to enforce it according to its terms." *Hartford Underwriters*, 530 U.S. at 6. Under the plain language of § 1621, the forfeiture proceedings against the accounts in the U.A.E. commenced during the "absence of the property" from the United States. However, even if we found it necessary to consider the legislative history of this provision, we do not believe that Congress' silence signifies that it did not intend for the statute of limitations period to be tolled indefinitely for bringing forfeiture actions against the proceeds of drug sales located in foreign countries. The Government faces a huge task in securing foreign assistance to stem the international drug trade and deal with its effects. Congress very well may have considered the effects of the tolling provision contained in § 1621 and simply intended to give law enforcement some leeway. *See Banco Espanol*, 295 F.3d at 27 ("[G]iven the uncertainties of foreign cooperation, Congress may not have wanted to force the government to bring forfeiture proceedings within five years to recover such property.").

### III.  Conclusion

Accordingly, for the reasons stated above, we affirm the judgment of the District Court.

A True Copy:
          Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*